UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMIRA A. SILIC, | |
| Plaintiff, | |
| v. | No. 12 CV 6557 |
| BBS TRUCKING, INC., | Judge Thomas M. Durkin |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Amira Silic ("Silic") filed a complaint against Defendant BBS Trucking, Inc. ("BBS"), alleging claims of discrimination under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA"). R. 9. On July 1, 2013, BBS moved for summary judgment, R. 27, arguing that Silic failed to demonstrate that BBS employed fifteen or more employees as required under Title VII, and twenty or more employees required under the ADEA. For the reasons explained below, BBS's motion for summary judgment is granted.

**BACKGROUND**

On November 16, 2011, Silic filed administrative charges of discrimination with the Equal Employment Opportunity Commission (EEOC). The EEOC issued a right-to-sue letter on May 18, 2012. R. 24 at 3. On October 16, 2012, Silic filed a two-count complaint, alleging claims of discrimination under Title VII of the Civil Rights Act of 1964 (Count I) and ADEA (Count II) against BBS. R. 9 ¶¶ 1, 14. On

1

March 11, 2013, the Court issued an order denying BBS's motion to dismiss Counts I and II and ordered limited discovery on the question of whether BBS is an employer under Title VII and the ADEA. R. 24 at 9. BBS filed a motion for summary judgment, which is currently pending before the Court. R. 27.

Silic, a 45-year old woman, worked as a truck dispatcher for BBS until November 2011, when she alleges she was wrongfully terminated. R. 24 at 2.[1] Specifically, Silic alleged that she was treated "differently and less favorably" than her male counterparts in the handling of work assignments and was held to a higher standard of performance than those male employees. R. 24 at 2. When Silic complained to the owner of BBS, Milorad Bosanac, about this treatment, he threatened her with termination. R. 24 at 2. Silic also claimed that co-owner, Ivan Bojic, created a hostile work environment by constantly yelling at Silic while she was on the telephone; interfering with her work on a daily basis by stopping her from calling drivers and booking loads; starting rumors that Silic and Bosanac were having an affair; and allowing male employees to refer to her as a "bitch." *Id.* Silic also claimed she was treated differently when Bosanac hired younger female employees and told drivers to coordinate with them rather than with her. *Id.*

BBS is an Illinois corporation that is licensed by the Federal Motor Carrier Safety Administration to operate as a motor carrier of property in interstate commerce. R. 28 ¶ 1. BBS contracts with independent contractor owner-operators who lease tractors and drivers to BBS in order to operate under BBS's federal motor

---

[1] The date Silic started working as a truck dispatcher for BBS is not pled in her first amended complaint. R. 9.

carrier authority. *Id.* ¶¶ 9, 10. In some cases, the owner-operators are corporations or sole proprietors. *Id.* ¶¶ 10, 12. BBS requires the owner-operators to provide prior employment verification and drug screenings before using their tractors or drivers. R. 36 ¶ 7. Each of the owner-operators that enter into lease agreements with BBS certify they are independent contractors and will not be provided benefits by BBS. R. 28 ¶¶ 18, 20. The owner-operators agree that the compensation they receive from BBS will not be subject to federal and state income tax and social security tax withholding. R. 28-4 at 6 (§IV(7)). The lease agreements for the tractors between owner-operators and BBS state that the owner-operators and drivers are not considered employees of BBS and that services will be provided without supervision. R. 28-4 at 6 (§IV(1)(7)). The owner-operators also agree pursuant to the lease agreements that they will pay the entire cost of operating and maintaining the leased equipment throughout the duration of the lease. R. 28-4 at 7 (§VI).

Further, owner-operators can refuse assignments, choose when they work and choose their own routes in transporting the shipments from origin to destination. R. 28 ¶¶ 14, 15. Drivers of the trucks maintained a BBS sign on their trucks with the lettering "USDOT" (U.S. Department of Transportation) and showing a Motor Carrier number assigned by the U.S. Department of Transportation. R. 33 ¶ 10. Each driver transporting shipments for BBS also received business cards stating the driver works for BBS. R. 36 ¶ 9. No driver was required to wear a BBS uniform while performing services under the lease agreement with BBS. R. 28 ¶ 16.

3

Excluding the owner-operators and drivers working for the owner-operators, BBS did not employ more than eight office employees during the time Silic worked at BBS. *Id.* ¶ 8. Taxes, social security, and other withholdings were retained from these eight employees and five of the eight office employees were issued W-2 statements. *Id.* ¶ 6. Silic filed an affidavit on August 26, 2013, stating that she gave work assignments to over fifteen drivers on a daily basis. R. 33-1 ¶ 12. In her affidavit, Silic states that based upon her knowledge, personal observations and BBS's policies and procedures, BBS had "complete control" over truck driver assignments and activities and that there were more than 15 drivers working for BBS. *Id.* ¶¶ 15, 16. Silic states that truck drivers working for BBS were not allowed to take trucking assignments for other employers because of BBS signs glued to the trucks. *Id.* ¶ 13. Additionally, Silic alleges that truck drivers working for BBS would be terminated from employment if a driver refused to move three "loads" in a day. *Id.* ¶ 14.

BBS moves for summary judgment on the basis that the owner-operators that contracted with BBS were merely independent contractors and did not rise to the level of "employees." R. 27. The Court agrees with BBS that the owner-operators are independent contractors, not employees, and BBS maintained no more than eight employees during the time Silic was employed in 2011. R. 32 ¶ 8. Accordingly, Silic cannot advance her Title VII and ADEA claims, and summary judgment for BBS is granted.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

### A. Independent Contractor vs. Employee

The Court must determine whether the owner-operators and drivers that contract with BBS are employees for purposes of meeting the fifteen employee minimum under Title VII and the twenty employee minimum under the ADEA. If the owner-operators and their drivers that contract with BBS are independent contractors, they cannot be counted towards the fifteen employees required for Title VII jurisdiction and twenty employees for ADEA jurisdiction. *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 437-38 (7th Cir. 1996). Because this case

arises under federal jurisdiction, the Court relies on the definition of "employee" provided by the precedent of the Seventh Circuit.[2] In order to determine whether an employee-employer relationship exists, "courts look to the economic realities of the relationship and the degree of control the employer exercises over the alleged employee." *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991). The following factors are considered: (1) the extent of the employers' control and supervision over the worker, including directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations. *Id.* at 378-79. Of these factors, the "employers' right to control is the most important when determining whether an individual is an employee or an independent contractor." *Ost*, 88 F.3d at 438, citing *Knight*, 950 F.2d at 378-79.

In *Ost*, the Seventh Circuit addressed the same issue before this Court. The plaintiff in *Ost* brought a Title VII discrimination claim. The plaintiff was the primary driver and owner of a limousine and contracted with West Suburban, an airport limousine dispatch service, to provide her limousine for dispatches. 88 F.3d at 436. West Suburban did not maintain its own fleet of limousines. *Id.* Rather, it

---

[2] It would be inappropriate to rely on the definition of "employee" from the Illinois Wage Act, as Silic argues, because Illinois state court decisions are not binding in this Court and this case arises under federal law—Title VII and the ADEA.

contracted with individuals to provide the vehicles it dispatched. *Id.* Plaintiff received her dispatching assignments from West Suburban but was responsible for all fees associated with owning and maintaining her vehicle, including taxes and insurance. *Id.* at 436, 438. Plaintiff was also free to contract with other companies to provide dispatching services, refuse to accept assignments offered to her, and could establish her own driving routes. *Id.* at 436-37. Contract drivers like the plaintiff never received paychecks from West Suburban, rather, their earnings came directly from the passengers. *Id.* at 438.

Applying the five factor test enumerated in *Knight,* with emphasis on the "control factor," the Seventh Circuit affirmed the district court's finding that drivers like the plaintiff were independent contractors of West Suburban rather than employees and, thus, could not be counted toward the fifteen-employee minimum required to establish jurisdiction under Title VII. *Id.* at 439. The Seventh Circuit found that the manner in which the drivers performed their services was primarily within their own control. *Id.* at 438. The Seventh Circuit found that drivers' starting times and the requirement that drivers call into West Suburban to inform them they were leaving for dispatch for the day were minimal constraints on contractors and insufficient to establish an employer-employee relationship. *Id.*

Many of the facts of Silic's case are similar to those in *Ost*. First, the lease agreement executed between owner-operators and BBS explicitly states that owner-operators are deemed independent contractors and not employees of BBS, and no employer-employee relationship is created by virtue of the agreement. R. 28-4 at 6

7

(§IV(1)). Second, BBS does not provide benefits to the owner-operators of the tractors nor is their compensation subject to federal and state income tax or social security tax. R. 28 ¶¶ 6, 7, 20; R. 28-4 at 6 (§IV(7)). Third, the tractors are owned by the owner-operators, not BBS, and, thus, the owner-operators are required to pay operating and maintenance costs. R. 28-4 at 7 (§VI). Fourth, the services the owner-operators perform for BBS are completed without BBS's supervision. R. 28-4 at (§IV(7)). Fifth, the owner-operators can refuse assignments, choose when they work and choose their own routes in transporting shipments. R. 28 ¶¶ 14, 15. Sixth, no driver is required to wear a BBS uniform while fulfilling their services under the lease agreement with BBS. R. 28 ¶ 16.

In *Ost*, the plaintiff was paid by the customers they dispatched, while in this case, the owner-operators were paid a percentage of gross receipts for their services by BBS; however, the owner-operators in this case were responsible for paying the wages, taxes, and benefits of their own drivers. R. 28-4 at 5 (§III); R. 28-4 at 7 (§VI(1)); R. 35 at 10. The lease agreement contained a "schedule of compensation" section describing how the owner-operators would be paid, R. 28-4 at 5 (§III). However, the details of how the owner-operators and their drivers performed their assignments stayed within the control of the owner-operators and their drivers. R. 28 ¶¶ 14, 15. *See Ost*, 88 F.3d at 439 (rejecting plaintiff's argument that his financial earnings were controlled by West Suburban which set rates at which contract drivers charged customers because performance of the work remained essentially within the control of the drivers).

Silic alleges that drivers were not allowed to take trucking assignments for other employers because of BBS signs glued to the trucks. R. 33-1 ¶ 13. However, the BBS lease agreement states that drivers may remove leased equipment from operation of BBS, which requires the removal of "identification placards, cards and fuel permits." R. 28-4 at 6 (§IV(5)). Additionally, the lease agreement states that when the trucks are not being used to perform services for BBS, all items of identification referring to BBS on the truck shall be removed or completely covered. R. 28-4 at 8 (§IX). Thus, the plain language of the lease agreement sets forth that drivers and owner-operators are allowed to take on trucking assignments for other employers so long as any affiliation with BBS is removed from their trucks.

Silic also alleges that drivers were terminated from employment with BBS if the driver refuses to move three "loads" in a day. R. 33-1 ¶ 14. However, the lease agreement states that BBS does not guarantee a driver any minimum number trips to be available during the driver's term with BBS and that BBS will make a "good faith effort" to provide the driver with as many trips as possible. R. 28-4 at 7 (§VIII). Additionally, drivers could refuse to take assignments and were free to choose when they worked. R. 28-4 at 2 ¶ 9. Thus, even if BBS has a three "load" per day minimum in order for drivers to continue their employment with BBS, drivers could refuse to take assignments, and the lease does not guarantee them any work.

The only factors indicating BBS's control over the owner-operators and their drivers relates to the required BBS sign on the trucks, and the background and drug checks. These requirements, however, are mandated by the U.S. Department

9

of Transportation Federal Motor Carrier Safety Administration in order to ensure the safety of the motorists and so the trucks can be properly identified. R. 35 at 4, 7. These federal requirements are minimal constraints on the contractors and they do not demonstrate BBS's control over the owner-operators.

The Court's conclusion that the owner-operators and drivers that contract with BBS are independent contractors and not employees is not affected by Silic's August 24, 2013 affidavit. The affidavit essentially adds details about whether there were fifteen or more truck drivers. R. 33-1. However, the fact that there were more than fifteen truck drivers is not disputed. The critical issue is whether or not the owner-operators were independent contractors or employees of BBS. Additionally, the statements in the affidavit regarding BBS's control over the drivers do not undermine the central undisputed fact that the nature of the relationship is one where control over the primary responsibilities and conditions of work rests with the owner-operators and drivers. Thus, even when considering the affidavit, the undisputed facts in this case show that the owner-operators and drivers that contracted with BBS were independent contractors. As such, BBS is not an "employer" for purposes of Title VII and the ADEA, and Silic's claims fail.

**B. Silic's Affidavit**[3]

Although the Court has already addressed the dispositive issue, the Court will address BBS's argument that the affidavit contradicts Silic's verified responses to the interrogatories served on BBS on June 4, 2013. BBS argues that as a result, Silic's affidavit should not be considered. R. 35 at 2. The Court finds there are serious questions as to whether or not the affidavit "contradicts" Silic's answers to the interrogatories.

The Seventh Circuit has held that a party may avoid summary judgment by submitting an affidavit that conflicts with its earlier deposition testimony only in a limited number of circumstances. *Adelman-Tremblay v. Jewel Co., Inc.,* 859 F.2d 517, 519-21 (7th Cir. 1988) (citing *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir. 1985)). One limited circumstance allows a subsequent affidavit to be considered to clarify ambiguous or confusing deposition testimony. *Id.* A second limited circumstance allows a contradictory supplemental affidavit to be considered if it is based on newly discovered evidence. *Id.* The Seventh Circuit has reiterated that the purpose of summary judgment motions—"to weed out unfounded claims, specious denials, and sham defenses"—is served by a rule that prevents a party from creating issues of credibility by allowing one of its witnesses to contradict his own prior testimony. *Id.* (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719

---

[3] Although arguments presented for the first time in a reply brief are waived, the Court finds for BBS on other grounds and, thus, will address BBS's argument for consideration of the affidavit even though it was first raised in BBS's reply brief for the first time. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.,* 299 F.3d 624, 631 (7th Cir. 2002); *West v. Meadwestvaco, Corp.,* 81 Fed.Appx. 74, 75 (7th Cir. 2003).

F.2d 1361, 1366 (8th Cir. 1983)). "It is well established that a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Richardson v. Bonds*, 860 F.2d 1433 (7th Cir. 1988); *Diliberti v. U.S.*, 817 F.2d 1259, 1263 (7th Cir. 1987). This rule extends to affidavits that contradict interrogatories. *See Donohue v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, n. 4 (7th Cir. 1992) (affirming district court's refusal to consider an affidavit which contradicted earlier responses to an interrogatory).

Here, BBS contends that Silic's affidavit expressly contradicts her responses to BBS's interrogatories submitted on June 4, 2013. R. 35 at 2-3. In BBS's interrogatory number two, Silic was asked to state "all facts and identify all documents and witnesses supporting her assertion that BBS was an employer of fifteen or more employees during the time period relevant to [her] claims." R. 28-5 ¶ 2. Silic responded, "N/A." *Id.* However, in her August 24, 2013 affidavit, Silic provided information potentially supporting the notion that BBS employed fifteen or more employees. R. 33-1. Silic's affidavit states that she "gave work assignments to over 15 drivers on a daily basis." R. 33-1 ¶ 12. Silic's affidavit also states that to her "knowledge and belief by observations, [and] duties assigned to [her]" there were more than "15 truck drivers working for BBS." *Id.* ¶ 15.

Silic attempts to explain this contradiction by objecting to the relevancy of interrogatory number two in her response to BBS's Rule 56.1 Statement. In the response, she states that "the failure of [Silic] to prove her case on interrogatories

rests on her credibility over BBS' pretext of having a business purpose to avoid having less than 15 employees." R. 32 ¶ 21. The Rule 56.1 response as quoted above by Silic is incomprehensible. BBS argues that Silic has provided no explanation as to why she now claims to have facts supporting her claim that there were more than 15 employees but did not have them when she provided her interrogatory responses on June 4, 2013. R. 35 at 3. The Court agrees that Silic had not provided a sufficient explanation as to why she now has answers to such questions but did not before. Moreover, Silic has provided no newly discovered evidence that she had when drafting her affidavit on August 24, 2013 which she did not have at the time she answered BBS's interrogatories on June 4, 2013.

Despite BBS's claims of the alleged "contradictions" BBS claims, Silic's affidavit does not necessarily contradict her responses of "N/A" to some of BBS's interrogatories. "N/A" merely means "not applicable," which is an inadequate interrogatory response in this context, but does not necessarily contradict Silic's affidavit. The better course would have been for BBS to have earlier moved to compel adequate responses to those interrogatories improperly answered "N/A." Having failed to do so, BBS cannot now complain that a "non-answer" directly contradicts Silic's affidavit.

But in the end, it is of no moment. Giving every benefit of the doubt to the non-movant, the Court has considered the entirety of Silic's affidavit and still reaches the same conclusion. The owner-operators and drivers that contracted with

13

BBS over the course of Silic's employment were independent contractors, not employees.

## CONCLUSION

Because Silic has failed to establish a genuine issue of fact regarding the number of employees BBS employed during the time she worked at BBS, and the number of employees is less than 15, BBS's motion for summary judgment, R. 27, is granted.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: September 24, 2014

14